

1

2    **Entered on Docket**          *Bruce A. Markell*
     **January 17, 2007**    _____

3                                **Hon. Bruce A. Markell**
                            **United States Bankruptcy Judge**

4    _____

5            UNITED STATES BANKRUPTCY COURT

6                 DISTRICT OF NEVADA

7                      * * * * * *

8    In re:                      )    Case No.: BK-S-06-10435-BAM
                                 )
9    DONALD SLUSHER,             )    Chapter 13
                                 )
10               Debtor.         )    Date:   August 25, 2006
                                 )    Time:   1:30 p.m.
11   _____ )

12

         **OPINION DENYING CONFIRMATION OF DEBTOR'S PLAN**

13   **I. Introduction**

14           Donald Slusher, a carpenter, filed for chapter 13 bankruptcy protection on March 17,

15   2006.  With his petition, Mr. Slusher filed his Schedules I & J, which contained statements of

16   his current income and current expenditures.  These showed monthly income and expenses

17   of $3,739.82 and $1,285, respectively, for a monthly net income of $2,454.82.

18           He also filed his form B22C, the means testing form.  This form declared seven

19   dependents, and so Mr. Slusher did not complete the expense portion of the means testing

20   form since the applicable median income for such a large family – $71,650 – exceeded his

21   declared annualized current monthly income of $53,832.48.[1]

22           On May 4, 2006, Mr. Slusher amended his schedules and his means testing form, in

23   part to reflect a reduction in claimed dependents from his originally claimed seven to just

24

25   _____

26         [1]Form B22C has six sections, but it only requires completion of the expense and the disposable
     income determination portions of the form (sections 4-6) if the debtor's annual family income exceeds
     the applicable state median income.

                                1

one.[2]  His Schedules I & J were also amended to indicate a revised monthly net income of $2,364.82, calculated by subtracting monthly expenses of $1,375 from monthly income of $3,739.82.[3]  Mr. Slusher's amended Form B22C, on the other hand, listed his annualized current monthly income at $44,472.48.  As this amount was higher than the applicable median income for a household of one – $37,243 – Mr. Slusher was then compelled to complete the rest of Form B22C.  He did so, with the end result being a reported  monthly disposable income of only $37.04.[4]  To arrive at this low amount, Mr. Slusher included  a $475 vehicle ownership expense for a car that he owns free of any liens.[5]

Notwithstanding the small net monthly disposable income listed on Form B22C, Mr. Slusher filed a chapter 13 plan indicating he had no "projected disposable income" but proposing to pay $200 a month for 36 months.   The chapter 13 trustee objected to this plan,

---

[2]No explanation has been given for the original claim or for the timing of the reduction, although a section 341 meeting was held the previous day.

[3]The small decrease in monthly net income stemmed from a new $90 expense for a mobile phone.

[4]He arrived at this amount after listing $3,706.04 of income and $3,669.00 of expenses.

[5]When Mr. Slusher filed his case, the proper vehicle ownership expense for one car was $471. http://www.irs.gov/businesses/small/article/0,,id=104623,00.html.  Mr. Slusher used the amount applicable before February 13, 2006, which was $475. http://www.usdoj.gov/ust/eo/bapcpa/20051017/bci_data/IRS_Trans_Exp_Stds_WE.htm.  This court will refer to the proper amount throughout this opinion.
    The above citation is to the United States Trustee website only because this court was unable to find the older Local Standards information on the Internal Revenue website.  Throughout, this opinion uses the numbers provided by the IRS' website whenever possible, since Congress has indicated that the applicable numbers are those provided by the IRS.  No disrespect is intended for the Office of the United States Trustee, which copies and compiles these numbers, but the court must consult the source indicated by Congress.
    This choice is not made without some trepidation.  For some reason, the IRS has disclaimed Congress' nomination of their numbers as inputs for bankruptcy cases.  *See* Allowable Living Expenses for Transportation, at http://www.irs.gov/businesses/small/article/0,,id=104623,00.html, which contains the following:
        **Disclaimer**: IRS Allowable Expenses are intended for use in calculating repayment of delinquent taxes. Expense information for use in bankruptcy calculations can be found on the website for the U.S. Trustee Program.

raising issues which arise under language added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).[6]

In particular, the trustee raises the following questions:

- whether "projected disposable income" as used in Section 1325(b)(1)(B) is the same as "disposable income" as defined in Section 1325(b)(2) & (3) for an above-median debtor such as Mr. Slusher;

- whether the term "applicable commitment period," as used in Section 1325(b)(4), refers exclusively to a span of time (*i.e.*, it is temporal), or instead is shorthand for a monetary multiplier; and

- whether a debtor may deduct standard vehicle ownership expenses on Form B22C for a vehicle owned free and clear of any liens.

In brief, this court concludes that:

- while disposable income is an important component of projected disposable income, they are not the same, although the amount of disposable income calculated under Section 1325(b)(2) is presumptively projected disposable income;

- The term "applicable commitment period" refers to a time period, not a monetary multiplier; and

- A debtor who owns a car free and clear of any liens may not deduct an ownership expense on line 28 of Form B22C.

## II. Projected Disposable Income

The chapter 13 trustee argues that Mr. Slusher's "projected disposable income" under Section 1325(b)(1)(B) should be based on his anticipated net income during the applicable commitment period as listed on Schedule J, line 20c, rather than the net of "current monthly income" and "reasonably necessary expenses" as listed on Form B22C, line 58. Mr. Slusher

---

[6]Pub. L. 109-8, 119 Stat. 23 (2005).

counters by arguing that the statutory provisions applicable to above-median income debtors are clear and require calculation of "disposable income," as defined in Section 1325(b), and that this amount is to be found through the calculations of Form B22C, and Form B22C alone.

Within this seemingly arcane and obscure question, there is much at stake. For the reasons discussed below, this court holds that line 58 of Form B22C is a presumptive, but not an exclusive, basis for calculating "projected disposable income" as used in 11 U.S.C. § 1325(b)(1)(A).

A. *Prior History of Section 1325(b)*

Under chapter 13, a debtor must normally commit all of his or her projected disposable income to payments under the plan.[7] This requirement is not new with BAPCPA. Before BAPCPA, courts and the relevant statute defined "projected disposable income" as income not reasonably necessary for maintaining or supporting the debtor or a dependent, with that determination being made on an estimated basis at plan confirmation. 11 U.S.C. § 1325(b)(2)(A) (2005); *see, e.g.,* Anderson v. Satterlee (*In re* Anderson), 21 F.3d 355, 357 n.4 (9th Cir. 1994) (holding debtor did not have to sign "best efforts certification" that all disposable income earned during case be paid to trustee because statute only required provision for 'payment of all projected disposable income' as calculated at the time of confirmation); Commercial Credit Corp. v. Killough (*In re* Killough), 900 F.2d 61, 64 (5th Cir. 1990) (holding that debtor need not include uncertain overtime income in projected disposable income even when historically such overtime was regularly earned). *But cf.* Rowley v. Yarnall, 22 F.3d 190, 192-93 (8th Cir. 1994) (although not addressing confirmation requirement, holding that discharge may not be granted unless chapter 12 debtor paid all disposable income earned during the case to chapter 12 trustee).

Under the pre-BAPCPA Bankruptcy Code, determining what expenses were "reasonably necessary" under this test required judges to make significant value judgments,

---

[7]An exception exists to this general rule if no objection is filed by either the chapter 13 trustee or by an unsecured creditor. 11 U.S.C. § 1325(b)(1).

leading to a wide diversity of rulings on whether particular expenses were justifiable.  *See e.g.*, *In re* Woodman, 287 B.R. 589, 592-593 (Bankr. D. Me. 2003) (tobacco expense of $240 each month was reasonable and necessary), *aff'd*, Evergreen Credit Union v. Woodman, 379 F.3d 1 (1st Cir. 2004); Univest-Coppell Village, Ltd. v. Nelson, 204 B.R. 497, 500 (E.D. Tex. 1996) (private school tuition of $395 each month was not reasonably necessary).  Revised Section 1325(b)(2) and new Section 1325(b)(3) partially restrict this discretion for above-median income debtors such as Mr. Slusher.

B.  *Section 1325(b) After BAPCPA*

If the trustee or the holder of an allowed unsecured claim objects to confirmation, current Section 1325(b)(1) mandates that the plan apply all of the debtor's "projected disposable income" received in the "applicable commitment period" toward payments to unsecured creditors.  Section 1325(b)(2) then defines the income portion of "disposable income" by reference to "current monthly income."  "Current monthly income" in turn is defined in Section 101(10A) as the debtor's average monthly income earned during the six month period ending on the first of the month in which the debtor files his or her petition.[8]

---

[8]To be precise, the term "current monthly income"--

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on–

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current monthly income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes an amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payment to victims of war crimes, and payment to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

11 U.S.C. § 101(10A).

1  For above-median debtors, such as Mr. Slusher, allowable expenses are then determined in

2  accordance with Sections 707(b)(2)(A) & (B).  *See* 11 U.S.C. § 1325(b)(3).

3       Form B22C attempts to restate the standards set forth in these subparagraphs to arrive

4  at an initial determination of disposable income.  But the form can be no more precise than

5  the statute on which it is based.  While Section 1325(b)(2) defines "disposable income," the

6  relevant language in Section 1325(b)(1) is "*projected* disposable income."  This distinction pre-

7  dates BAPCPA's adoption, and intensifies the question of whether Congress intended to

8  differentiate between the pre-existing term with a new definition — "disposable income" —

9  and the undefined, existing, composite term "projected disposable income."  *See* Anderson

10  v. Satterlee (*In re* Anderson), 21 F.3d 355, 357 n.4 (9th Cir. 1994).

11       This raises significant questions of statutory interpretation, a topic about which this

12  court has previously written.  *In re* Trejos, 352 B.R. 249, 254-259 (Bankr. D. Nev. 2006); *In re*

13  Kane, 336 B.R. 477 (Bankr. D. Nev. 2006).  To summarize this court's view, the starting point

14  for all issues of statutory interpretation is the presumption that Congress intended the

15  accepted and plain meaning of the words it used in the statute.  As the Supreme Court has

16  said:

17       The starting point in discerning congressional intent … is the existing statutory
         text … and not the predecessor statutes.  It is well established that "when the
18       statute's language is plain, the sole function of the courts — at least where the
         disposition required by the text is not absurd — is to enforce it according to its
19       terms."

20  Lamie v. United States Trustee, 540 U.S. 526, 534 (2004), *quoting* Hartford Underwriters Ins.

21  Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted), *in*

22  *turn quoting* United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241(1989), *in turn quoting*

23  Caminetti v. United States, 242 U.S. 470, 485 (1917).

24       In determining the sense of the words Congress chose, it is appropriate to investigate

25  the contexts in which English generally and the Bankruptcy Code specifically employ the

26  same or similar words.  *E.g.,* Rousey v. Jacoway, 544 U.S. 320, 326-27 (2005) (looking at use

1    of "on account of" in provisions of the Bankruptcy Code other than the one at issue).  Put

2    another way, the meaning of statutory language is best revealed by examining not only the

3    general usage in English of the chosen words, but also through a coordinate review of any

4    specialized use of those terms in the code in which they are found.  *Id.*; *see also* John F.

5    Manning, *What Divides Textualists From Purposivists?*, 106 COLUM. L. REV. 70, 79-80 (2006).

6          With respect to the general use of the words used, this examination may include

7    dictionaries, etymologies, and guides to grammar and common usage such as the various

8    canons of statutory construction.  *E.g.*, Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle

9    St. P'ship, 526 U.S. 434, 460 (1999) (using dictionaries to determine meaning of "on account

10    of"); Muscarello v. United States, 524 U.S. 125, 129 (1998) (using etymology of "carries" to

11    construe reach of statute that prohibited carrying firearms); Connecticut Nat'l Bank v.

12    Germain, 503 U.S. 249, 253 (1992) ("canons of construction are no more than rules of thumb

13    that help courts determine the meaning of legislation."); San Jose Christian Coll. v. City of

14    Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004) ("'To determine the 'plain meaning' of a term

15    undefined by a statute, resort to a dictionary is permissible.'").  In conjunction with this

16    general examination, as indicated above, a court should also examine, in the case of an

17    integrated and cohesive statute such as the Bankruptcy Code, how that code uses or employs

18    the words or phrase in dispute, *e.g.*, *Rousey*, 544 U.S. at 326-27, and how practice has given

19    content to the code's provisions and strictures.  Cohen v. de la Cruz, 523 U.S. 213, 221 (1998)

20    ("We … 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear

21    indication that Congress intended such a departure'"), *quoting* Pa. Dep't of Pub. Welfare v.

22    Davenport, 495 U.S. 552, 563 (1990).

23          In applying these principles to Section 1325(b), the first step is to note that while the

24    term "disposable income" is defined in Section 1325(b)(2), the subsection contains no

25    reference to, or definition of, the term at issue here: "projected disposable income."  This does

26    not render the text meaningless or contradictory, but merely indicates that Congress intended

1   to differentiate between the term "disposable income" found in paragraph (2) and "projected

2   disposable income" found in paragraph (1).  *See In re* Jass, 340 B.R. 411, 415 (Bankr. D. Utah

3   2006) ("The court must give meaning and import to every word in a statute"); *see also* BFP v.

4   Resolution Trust Corp., 511 U.S. 531, 537 (1994) ("Congress acts intentionally and

5   purposefully when it includes particular language in one section of a statute but omits it in

6   another").

7        Among other things, the word "projected" can mean "put forth as a project; planned,

8   devised."[9] That was the view taken by the Ninth Circuit pre-BAPCPA with respect to Section

9   1325(b).  *Anderson*, 21 F.3d at 357 n.5 (when construing pre-BAPCPA § 1325(b)(1)(B)'s use of

10   "projected disposable income," the court noted that "Webster's defines 'project' as '1.b: to

11   plan, figure or estimate for the future.'").  Because the operative language in Section

12   1325(b)(1)(B) did not change – the statute referred and refers to "projected disposable

13   income" both before and after BAPCPA – *Anderson* provides the presumptive answer for the

14   proper construction of the term.

15        That this view has much to commend can also be seen from a commonsense reading

16   of the statute.  The statutory definition of "disposable income" for an above-median debtor

17   requires the debtor to use the previous six months' average income as the sole basis for

18   determining disposable income over the next five years.  Were "disposable income," as

19   defined in Section 1325(b)(2), used in place of "projected disposable income" in Section

20   1325(b)(1)(B), the future-oriented word "projected" would be given absolutely no effect.

21   Courts strive to avoid such a result.  *See* Northwest Forest Res. Council v. Glickman, 82 F.3d

22   825, 834 (9th Cir. 1996) ("[A] statute must be interpreted to give significance to all of its parts.

23   We have long followed the principle that statutes should not be construed to make

24   surplusage of any provision.") (citations omitted).

25

26        [9]12 OXFORD ENGLISH DICTIONARY 599 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. Oxford Univ. Press 2001).  *See also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 993 (Frederick C. Mich, ed., 11th ed. 2004).

Furthermore, the term "projected disposable income" as used in Section 1325(b)(1)(B) does not exist in isolation in the Bankruptcy Code. The term appears in five other places in the Code, none of which define it, and only one of which refers back to the definition of "disposable income" provided in Section 1325(b)(2).[10]  *See, e.g.,* 11 U.S.C. §§ 1129(a)(15)(B); 1222(a)(4); 1225(b)(1)(B); 1225(b)(1)(C); 1322(a)(4).

By contrast, other Bankruptcy Code sections use the term "disposable income" without the word "projected," and these references often incorporate the definition in Section 1325(b)(2).  *See, e.g.,* 11 U.S.C. §§ 527(a)(2)(C); 528(c)(1); 541(b)(7); 1322(d)(2)(F).  Congress' choice to use both "projected disposable income" and "disposable income" in the Code indicates an intent to apply different meanings to the two terms. Given this, it is common sense that while "disposable income" may explicitly refer to the past, "projected disposable income" undeniably looks to the future.  *See In re* Casey, 2006 WL 3071401, at *2 (Bankr. E.D. Wash. 2006) ("[The word 'projected'] requires a court to examine anticipated disposable income rather than historical disposable income, estimated disposable income, or some other type of disposable income.").

This approach is not odd or unusual. It requires the use of a defined set of historical financial figures as a starting point for the determination of future finances. This approach is reasonable, so long as historical figures are not the exclusive determinants of those finances. Otherwise, projecting static historical figures over a future period would be like attempting to ascertain the future value of a company's stock based solely on the average of its stock price over the previous six months, without taking into account currently anticipated market trends. Using just the debtor's static historical income average and nothing else could lead to a projection unhinged from reality. As a result, this court must view the definition of "disposable income" not as a definition for the term "projected disposable income" within

---

[10]Although Section 1129(a)(15)(B) refers to the definition of "disposable income" provided in Section 1325(b)(2), none of the other sections mentioning "projected disposable income" provide any guidance as to the term's proper interpretation.

Section 1325(b)(1)(B), but only as a presumption regarding the meaning of that term.  *See In re* Jass, 340 B.R. at 416;[11] *contra In re* Alexander, 344 B.R. 742, 749 (Bankr. E.D.N.C. 2006); *In re* Rotunda, 349 B.R. 324, 331 (Bankr. N.D.N.Y. 2006); *In re* Farrar-Johnson, 2006 WL 2662709, at *3 (Bankr. N.D. Ill. 2006).

Put another way, if the number on line 58 of Form B22C accurately represents the anticipated future income of the debtor, the court will likely use it as "projected disposable income, " in large part because, by hypothesis, there are no facts which could rebut the presumption.  Yet in certain circumstances, such as when a debtor gains or loses a job or when he or she receives an increase or decrease in pay immediately before filing bankruptcy, Form B22C is less authoritative, and serves only as a starting point for an investigation that will include an examination of Schedules I & J.[12]  *See In re* Pak, 2006 WL 3690181, at *3 (Bankr. N.D. Cal. 2006) ("[O]ne of the primary purposes of BAPCPA's consumer amendments … [is] to force 'can-pay' debtors to pay their creditors what they can, through  a chapter 13 plan. While Congress also expressed the intent to limit bankruptcy judges' discretion … the consumer amendments nevertheless contain some provisions requiring judges to exercise discretion.").

*In re* Jass, 340 B.R. 411 (Bankr. D. Utah 2006) presented one of the unusual

---

[11]"Congress changed the definition of 'disposable income' under § 1325(b)(2), replacing it with a specific and detailed definition.  Despite these changes, Congress did not remove the word 'projected' from § 1325(b)(1)(B), nor did it add the word 'projected' to the term 'disposable income,' carefully defined by § 1325(b)(2).  The Court can only conclude that the available evidence of Congressional intent underlying § 1325(b) bolsters its holding that the number resulting from Form B22C is not always a debtor's 'projected disposable income.'"  *In re Jass*, 340 B.R. at 417.

[12]*See In re* Hardacre, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006) ( "A strict application of section 101(10A)'s definition of 'current monthly income' can have serious consequences in some cases.  For example, if 'current monthly income' as defined in section 101(10A) applies, a debtor who anticipates a significant enhancement of future income is provided strong incentive to file a Chapter 13 as soon as possible.  The amount of money that she would be required to commit to the plan would be based upon her lower average income prior to filing.  On the other hand, a debtor who finds herself in the unfortunate circumstance of having a lower income after filing her petition might find that she is unable to confirm a plan because she cannot devote to the plan a 'projected disposable income' predicated upon her prepetition income.").

circumstances described above.  Due to large medical expenses experienced by the husband-debtor, the Jass's disposable income as determined by Form B22C was not an accurate projection of disposable income during the plan term.  If the Jasses had used only the disposable income from Form B22C, they would not have been able to either make the required payments or confirm their plan.  Judge Thurman adopted a flexible approach based on the reasoning outlined above.  In addition, he looked to the underlying purpose of the Bankruptcy Code to aid in his determination.  As he stated, "The overarching policy of the Bankruptcy Code is to afford a debtor a 'fresh start.'"  *In re* Jass, 340 B.R. at 417.

Although BAPCPA made many changes to benefit creditors, it did not eliminate completely the Code's rehabilitative aspect.  *See id.*  Debtors overburdened by debt may still use the Bankruptcy Code to relieve themselves of much of this burden.  As recognized in *Jass*, if this court reads Section 1325(b) to leave the judiciary no discretion, many otherwise feasible plans could no longer be confirmed, much to the detriment of creditors and debtors alike.[13] *Cf. In re* Alexander, 344 B.R. 742 (Bankr. E.D.N.C. 2006); *In re* Guzman, 345 B.R. 640 (Bankr. E.D. Wis. 2006).

Language in Section 1325(b)(3) that points to Section 707(b)(2) as a source for the expense side of disposable income does not lead to a contrary result, as the court in *In re* Fuller, 346 B.R. 472 (Bankr. S.D. Ill. 2006) seemed to hold.  *Fuller* considered *Jass* along with three other recent cases on point[14] to ascertain whether a determination of expenses for

---

[13]In a chapter 13 case, judges must "do 'rough justice,' and need every statutory tool at their disposal to achieve it on a program-wide basis, though they might not achieve justice in every case.  Congress' retention of the 'good faith' test, and the presence of the word 'projected,' modifying the phrase 'disposable income,' are the key tools.  BAPCPA did not take those away."  *In re* LaSota, 351 B.R. 56, 61 (Bankr. W.D.N.Y. 2006).

[14]*See In re* Hardacre, 338 B.R. 718 (Bankr. N.D. Tex. 2006) ("'projected disposable income' refers to the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income"); *In re* Kibbe, 342 B.R. 411 (Bankr. D.N.H. 2006) ("[i]n a below median case, 'projected disposable income,' as used in section 1325(b)(1)(B), is based on a debtor's current income and expenses as reflected in Schedules I and J"); *In re* McGuire, 342 B.R. 608 (Bankr. W.D. Mo. 2006) (an above-median case where the court held that "the Form B22C disposable income calculation is

above-median debtors must invariably follow Section 1325(b)(3).  The court concluded that reasonably necessary expenses had to exactly follow the expense portion of Form B22C. *Fuller* appears, however, to apply excessive weight to the word "shall" within Section 1325(b)(3), ignoring the preceding words.  The relevant language of Section 1325(b)(3) reads, "amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) …"  While several courts have noted the importance of the word "shall" within that section, none have noted the words immediately preceding it, *i.e.* "paragraph (2)."  Section 1325(b)(3) applies only to a determination of reasonably necessary future expenses within the definition of "disposable income."  *Contra In re* Tranmer, 2006 WL 3366458, at *10 (Bankr. D. Mont. 2006) ("The use of 'shall' in section 1325(b)(3) is mandatory and leaves no discretion with respect to the expenses and deductions that are to be deducted in arriving at disposable income.") (*quoting In re* Barr, 341 B.R. 181, 185 (Bankr.M.D.N.C. 2006).

As discussed above, however, "disposable income" and "projected disposable income" are not the same terms. The historical nature of "disposable income" is a presumptive guide to the prospective "projected disposable income," but only a guide.  *See In re* Foster, 2006 WL 2621080, at *6 (Bankr. N.D. Ind. 2006) (holding that the analysis under Form B22C is "the initial but not the ultimate measure of the debtors' financial condition and ability to fund their plan."); *accord In re* Bossie, 2006 WL 3703203, at *2 (Bankr. D. Alaska 2006).  As such, the language of Section 1325(b)(3) is only a further definition of "disposable income" in the case of above-median debtors, and thus only contributes to the establishment of the presumptive "disposable income" calculation.  *See, e.g., In re* Edmunds, 350 B.R. 636, 643-644 (Bankr. D.S.C. 2006) ("[T]he Court finds that the expense allowance provided by § 1325(b)(3) is a forward-looking concept and is not strictly determined by the mathematical calculation of Form B22C"); *In re* Teixeira, 2006 WL 3780539, at *2 (Bankr. D.N.H. 2006)

_____

merely a starting point, not a determinative number").

("[T]his Debtor has experienced changed circumstances, and the 'disposable income' calculated with section 1325(b)(2)'s formula is not representative of the Debtor's *projected* disposable income that she actually expects to earn during the term of her plan"); *contra In re* Farrar-Johnson, 2006 WL 2662709, at *3 (Bankr. N.D. Ill. 2006) ("One of the aims of the means test was to limit judicial involvement-and so judicial discretion-by making mechanical the determination of abuse under section 707(b).  The means test in section 1325(b)(3) is meant to have the same mechanical effect.") (citations omitted)[15].

As a result, unlike the court in *Fuller*, this court holds that for above-median debtors, "disposable income" as calculated by Form B22C is only a presumptive guide in any determination of "projected disposable income" as required by Section 1325(b)(1)(B).  For above-median debtors such as Mr. Slusher, this presumption is further strengthened by the language in Section 1325(b)(3), but it remains a presumption nevertheless.

**III.  Applicable Commitment Period**

The next issue is the equally contentious question of how to interpret "applicable commitment period" within Sections 1325(b)(1)(B) and (b)(4).  As described above, if a trustee or other interested party objects to plan confirmation, the plan must provide "that all of the debtor's projected disposable income to be received in the applicable commitment period … be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). Section 1325(b)(4) defines "applicable commitment period" as three years for

---

[15]The Court acknowledges that its result is not what every person reading Section 1325(b) might reach, particularly considering the general view that BAPCPA sought to limit bankruptcy judges' discretion in various areas.  Regardless of what this court may write, there remains a common sense argument to the effect that if Congress had meant "disposable income" to be  a presumptive guide for "projected disposable income" it could have said so in explicit terms.  But it didn't, and also didn't amend Section 1325(b) so that there is but one, unambiguous, canonical reading.  In this vacuum, courts must puzzle over the intended differences, if any, between "projected" disposable income and "disposable income" without a modifier.  This court's result, then, can perhaps best be characterized as the least flawed of all possible interpretations, each of which is in some way unsatisfactory in its own right.

1    below-median debtors and five years for above-median debtors.[16]  Although apparently

2    straightforward, as with much of BAPCPA, the text Congress used plausibly lends itself to

3    at least two different interpretations of what exactly "applicable commitment period" means.

4         Although his income is above the applicable Nevada median, Mr. Slusher nevertheless

5    proposed a 36-month plan.  He contends that a "plain meaning" analysis of Sections

6    1325(b)(1)(B) and (b)(4) allows this, arguing that these provisions use "applicable

7    commitment period" as a monetary multiplier (a multiplicand), rather than as a purely time

8    or temporal requirement.  Under this view, Mr. Slusher contends that he is only required to

9    commit that income which is equal to an amount obtained by multiplying his monthly

10   "projected disposable income" by the number of months in the "applicable commitment

11   period."  Here, according to Mr. Slusher's position, that would require multiplying his listed

12   disposable income of $37.04 a month by 60 months (a 5-year "applicable commitment period"

13   for above-median debtors), for a total of $2,222.40.  In short, Mr. Slusher's position is that any

14   plan, regardless of length, may be confirmed so long as his unsecured creditors receive

15   $2,222.40.  Thus, because debtor's plan proposes $200 each month for 36 months (a total of

16   $7,200.00), he has exceeded the monetary requirement of the plan and therefore should not

17   be forced to remain in the plan for a full five years.[17]

18   _____

         [16]The relevant text of Section 1325(b)(4) reads:

19

20       (4) For purposes of this subsection, the "applicable commitment period" —
              (A) subject to subparagraph (B), shall be —
                  (i) 3 years; or

21                (ii) not less than 5 years, if the current monthly income of the debtor and the
              debtor's spouse combined, when multiplied by 12, is not less than —

22                    (I) in the case of a debtor in a household of 1 person, the median family
                  income of the applicable State for 1 earner…

23            (B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but
              only if the plan provides for payment in full of all allowed unsecured claims over a shorter

24       period.

25       [17]Some courts have argued that because Section 1325(b)(1)(B) mandates that "projected

26   disposable income" during the "applicable commitment period" be applied to make payments to
     unsecured creditors under the plan, "applicable commitment period" is only relevant if the debtor

14

As noted before, Mr. Slusher contends that the "plain meaning" of the statute supports his view. The debtor reads the statute as requiring the payment of all "projected disposable income *to be received* in the applicable commitment period." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). Thus, Mr. Slusher argues, he need only propose a plan that includes an amount of projected disposable income equal to what he would receive during the "applicable commitment period," rather than a plan lasting for the entire length of the "applicable commitment period." Although this reading of the statute has some support,[18] this court does not agree with the debtor's "plain meaning" analysis.

Because this court does not find the language of Sections 1325(b)(1)(B) and (b)(4) patently absurd, "plain meaning" is indeed the tool that must be used to analyze the statute. *See Ron Pair Enterprises*, 489 U.S. at 241; *In re* Kane, 336 B.R. at 486-89. Since the court must apply the statute "according to its terms," *Ron Pair Enterprises*, 489 U.S. at 241, a good place to start would be with the term "applicable commitment period." The code provides no specific definition of the words "applicable," "commitment," or "period." However, the dictionary gives the following definitions:

<u>Applicable</u>: fit or suitable for its purpose; appropriate[19]

---

in fact has "projected disposable income" to distribute to those creditors. *See In re* Alexander, 344 B.R. 742, 751 (Bankr. E.D.N.C. 2006); *In re* Daniel, 2006 Bankr. LEXIS 3456 (Bankr. D. Kan. 2006). Because this court holds that the debtor in this case has projected disposable income, it need not determine now whether the "applicable commitment period" exists when no disposable income is available.

[18]*See e.g. In re* Fuger, 347 B.R. 94, 101 (Bankr. D. Utah 2006) ("The Court believes that the manifest intent of Congress underlying §1325(b)(1)(B) is … to require debtors to commit to a specific return to unsecured creditors."); Keith M. Lundin, Chapter 13 Bankruptcy § 500.1 (3d ed., Bankruptcy Press 2000 & Supp. 2006) ("Under § 1325(b)(1), the applicable commitment period is a number of years that is multiplied by annualized disposable income to determine the amount of projected disposable income that must be paid to unsecured creditors to satisfy the confirmation test in § 1325(b)(1). The applicable commitment period does not require that the debtor actually make payments for any particular period of time. Rather, it is the multiplier in a formula that determines the *amount* of disposable income that must be paid to unsecured creditors.").

[19]1 Oxford English Dictionary 575 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. Oxford Univ. Press 2001). *See also* Merriam-Webster's Collegiate Dictionary 60 (Frederick C. Mich, ed., 11th ed. 2004).

<u>Commitment</u>: the committing of oneself . . . (to a particular course of conduct)[20]

<u>Period</u>: a length of time[21]

Taken together in the context of the Bankruptcy Code, "applicable commitment period" thus stands for the appropriate length of time during which the debtor has agreed to make payments. It is hard to imagine analyzing the "plain meaning" of "applicable commitment period" and coming to the conclusion that the word "period" means anything other than "time." *See In re* Girodes, 350 B.R. 31, 35 (Bankr. M.D.N.C. 2006) ("The use of the term "period" implies time period rather than amount. Temporal references are made throughout Chapter 13 of the Bankruptcy Code."). Had Congress wanted to signify a multiplicand, rather than a temporal period, it could easily have done so; it did just that in numerous other areas of the Bankruptcy Code, including other areas of Section 1325. *See, e.g.,* 11 U.S.C. §§ 507(a)(5)(B)(i) ("the number of employees covered by each such plan multiplied by $10,000"); 704(b)(2); 707(b)(2)(A)(i) ("if the debtor's current monthly income, reduced by the amounts determined under clauses (ii), (iii), or (iv), and multiplied by 60 is not less than"); 707(b)(2)(B)(iv); 707(b)(6); 707(b)(7)(A); 1322(d)(1); 1322(d)(2); 1325(b)(3) ("if the debtor has current monthly income, when multiplied by 12"); 1325(b)(4)(A)(2); 1326(b)(3)(B)(ii). From these sections, this court can only conclude that, at least in this area, Congress says what it means and means what it says — if it wants to use a multiplicand, it will say so, usually with the words "multiplied by"; conversely, if Congress uses the word "period," it means just that – a temporal division. Indeed, "the use of a particular phrase in one statute but not in another 'merely highlights the fact that Congress knew how to include such a limitation when it wanted to.'" *In re* Donald, 343 B.R. 524, 537 (Bankr. E.D.N.C. 2006),

---

[20]3 OXFORD ENGLISH DICTIONARY 560 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. Oxford Univ. Press 2001). *See also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 250 (Frederick C. Mich, ed., 11th ed. 2004).

[21]11 OXFORD ENGLISH DICTIONARY 558 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. Oxford Univ. Press 2001). *See also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 921 (Frederick C. Mich, ed., 11th ed. 2004).

*quoting In re* Coleman, 426 F.3d 719, 725 (4th Cir. 2005);[22] *In re* Meyer, 2006 WL 3505379, at *8 (Bankr. D.N.M. 2006).

Although the meaning of "applicable commitment period" can be determined from a common-sense reading of the Code, it is useful to compare the current language to what existed pre-BAPCPA. Before the 2005 amendments, Section 1325(b)(1)(B) set forth the plan length for a chapter 13 bankruptcy by stating that if a trustee or allowed unsecured creditor objected to the plan, the court could not approve it unless the plan provided that "all of the debtor's projected disposable income to be received in the three-year period beginning on the date of the first payment" went to "make payments under the plan." 11 U.S.C. § 1325(b)(1)(B) (2005). The only changes to 1325(b)(1)(B) made by Congress in BAPCPA were substituting "applicable commitment period" for "three-year period" and adding the words "to unsecured creditors" between "payments" and "under."

Before BAPCPA, although a few courts held that debtors who received a windfall could pay off the amounts owing under their plan before the three-year period ended without paying unsecured creditors the full amount of their claims,[23] most courts construed the Section 1325(b)(1)(B) "three-year period" as a temporal minimum during plan confirmation. *See In re* Davis, 349 B.R. 449, 455-456 (Bankr. E.D. Mich. 2006) ("[A] monetary interpretation of ACP represents a gross departure from pre-BAPCPA practice that is not

---

[22]This point is further illustrated by the use of the word "period" within Section 1322. Congress included a maximum chapter 13 plan length in Section 1322. *See* Section 1322(d). For above-median debtors, the section states that "the plan may not provide for payments over a period that is longer than 5 years." 11 U.S.C. § 1322(d)(1). Although this section states only a maximum length, rather than a mandatory length, Congress used the word "period" to explicitly describe the maximum length of time for which a plan could provide payments. Reading the word "period" as used here to signify a multiplicand would produce an insensible result.

[23] *See e.g., In re* Richardson, 283 B.R. 783, 801-2 (Bankr. D. Kan. 2003) ("If after obtaining confirmation of a plan, a debtor receives a windfall and proposes to pay the total projected disposable income before the end of the plan term, the trustee should accept the money, distribute it according to the plan, and grant the debtor a discharge"); *In re* Smith, 237 B.R. 621, 626 (Bankr. E.D. Tex. 1999); Matter of Casper, 154 B.R. 243, 246 (N.D. Ill 1993). But note, all of these cases involved post-confirmation payoffs, rather than court approval of a less-than-three-year plan.

17

justified by the language or structure of the statute.  Prior to BAPCPA's enactment, debtors could not exit chapter 13 in less than three years without paying in full the allowed unsecured claims.  BAPCPA's revision of Section 1325, albeit significant, has not changed this tenet of pre-BAPCPA practice"), *quoting In re* Schanuth, 342 B.R. 601, 606-8 (Bankr. W.D. Mo. 2006); *In re* McGuire, 342 B.R. 608, 615 (Bankr. W.D. Mo. 2006); *see also, e.g., In re* Keller, 329 B.R. 697, 700 (Bankr. E.D. Cal. 2005); *In re* Martin, 232 B.R. 29 (Bankr. D. Mass. 1999).  It appears that the majority of pre-BAPCPA courts viewed the three-year requirement under pre-BAPCPA Section 1325(b)(1)(B) as temporal in nature, at least in the context of plan confirmations rather than modifications, and this court sees little reason to alter that reasoning merely because "applicable commitment period" was substituted for "three-year period."  Cohen v. de la Cruz, 523 U.S. 213, 221 (1998) ("We … 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure'"), *quoting* Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 563 (1990).

This pre-BAPCPA view of Section 1325(b)(1)(B) is only further strengthened by other changes implemented in BAPCPA.[24]  Section 1325 clearly states that the "applicable commitment period" "may be less than 3 or 5 years, whichever is applicable … but *only if* the plan provides for payment in full of all allowed unsecured claims over a shorter period."  11 U.S.C. § 1325(b)(4)(B) (emphasis added).  Why would Congress include this provision if all that was required of a chapter 13 debtor was to pay a set amount of money under the plan?  Under the monetary view, Section 1325(b)(4)(B) is rendered at best a tautology, and at worst

---

[24]The legislative history for BAPCPA, although scant, provides some indication that Congress intended a temporal meaning for "applicable commitment period."  The House Report relevant to this change states:

> *Chapter 13 Plans to Have a Five-Year Duration in Certain Cases.*  Paragraph (1) of § 318 of the Act amends Bankruptcy Code §§ 1322(d) and 1325(b) to specify that a chapter 13 plan may not provide for payments over a period that is not less than five years if the current monthly income of the debtor and the debtor's spouse combined exceed certain monetary thresholds.…The applicable commitment period may be less if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

H.R. REP. NO. 109-31, pt. 1, 1st SESS. 79 (2005).

1    entirely surplusage.  *See In re Davis,* 348 B.R. 449, 455 ("Under this interpretation of ACP, §

2    1325(b)(4)(B) doesn't really state anything more than that a debtor does not have to pay more

3    than 100% on his unsecured claims").

4           Understanding "applicable commitment period" as meaning a time period is also in

5    accord with the changes Congress implemented to Section 707(b), governing above-median

6    debtors in chapter 7 cases.  Congress added the means test to ensure that above-median

7    debtors who could afford to repay their creditors were required to do so by entering chapter

8    13.  Alane A. Becket & Thomas A. Lee III, *Applicable Commitment Period: Time or Money?*, AM.

9    BANKR. INST. J. 16, 44 (March 2006).  Under the multiplicand view, however, the expressed

10   congressional intent behind BAPCPA would be thwarted.

11          If the ostensible purpose of the means test was to direct more Chapter 7 debtors
            into Chapter 13 to facilitate voluntary repayment to unsecured creditors, it
12          seems unlikely that Congress would have so changed Chapter 13 as to now
            allow a debtor to pay a pre-determined discount price (which in many cases
13          will be zero) to her unsecured creditors as and when the debtor chooses, and
            exit Chapter 13 without either having an ongoing commitment to make her
14          best efforts over some required period of time to repay her creditors, or having
            ever subjected her assets to be administered for the benefit of those creditors
15          by a trustee, as would occur in a Chapter 7 case.

16   *In re* Davis, 348 B.R. at 457.

17          As discussed in *Davis*, the essence of a chapter 13 case is that the debtor has made an

18   ongoing *commitment* to provide all disposable income over a period of time to repay creditors.

19   *Id.*  The use of the word "commitment" within "applicable commitment period" exemplifies

20   this congressional goal, implying that the debtor has an ongoing obligation.  With an ongoing

21   obligation by the debtor to remain in bankruptcy for the plan term, interested parties can

22   monitor the debtor and capture any increases in the debtor's income during that time.

23   Treating "applicable commitment period" as a multiplicand defeats this purpose by allowing

24   a debtor to use chapter 13, with its expanded discharge,[25] to determine at the outset of the

25   _____

26   [25]Although BAPCPA significantly limited the "superdischarge" previously provided in chapter
     13, the discharge under Section 1325 is still broader than that offered under Sections 727 and 1141.
     Although some of the categories dischargeable in chapter 13 may be of limited utility or applicability,

chapter 13 case a set amount owed to creditors.  Thus under this view, chapter 13 is simply an alternate form of "lump-sum" payout to creditors, but one in which the debtor is not required to use any prepetition assets and from which he is discharged from several otherwise nondischargeable debts.  Under any stretch of the imagination, this court does not believe that such a result was what Congress intended by enacting BAPCPA.

Furthermore, treating the term "applicable commitment period" as a multiplicand would negate much of Section 1329's utility.  Section 1329 provides a process for any interested party to seek modification of the chapter 13 plan after confirmation but "before the completion of payments" under the plan. 11 U.S.C. § 1329(a).  This section is bolstered by other financial reporting requirements added in BAPCPA, such as Section 521(f)'s requirement that the debtor submit annual tax returns on request to any interested party, allowing those parties to determine if the debtor's financial circumstances have changed sufficiently to justify seeking modification.  But if the debtor manages to produce a lump-sum payoff to the trustee before the trustee or another interested party seeks modification, all interested parties could be barred at that time from modifying the plan.  Once his plan is confirmed, a debtor could simply pay off the remaining monetary balance through a refinancing of a homestead interest or some other exempt source, obviating the need for

---

the following is a partial list of claims dischargeable under chapter 13 but not dischargeable under chapter 7:

- Damages for certain willful and malicious injury to the property of another.  11 U.S.C. § 523(a)(6).
- Certain civil fines owed to a governmental unit. 11 U.S.C. § 523(a)(7).
- Certain debts for which discharge was denied or waived in a previous bankruptcy case. 11 U.S.C. § 523(a)(10).
- Damages for fraud in a fiduciary capacity committed with respect to any depository institution. 11 U.S.C. § 523(a)(11).
- Certain obligations to federal depository institutions. 11 U.S.C. § 523(a)(12).
- Fines or penalties imposed under federal election law. 11 U.S.C. § 523(a)(14B).
- Non-support obligations incurred in the course of divorce or separation. 11 U.S.C. § 523(a)(15).
- Certain membership association fees. 11 U.S.C. § 523(a)(16).
- Certain court fees. 11 U.S.C. § 523(a)(17).
- Amounts owed to certain pension, profit-sharing, or stock bonus plans. 11 U.S.C. § 523(a)(18).
- Certain amounts owed due to violations of federal securities laws. 11 U.S.C. § 523(a)(19).

further financial review and preventing interested parties from seeking a modification based on changed circumstances. *See* Pancurak v. Winnecourt (*In re* Pancurak), 316 B.R. 173, 176 (Bankr. W.D. Penn. 2004) ("Under § 1329(a), the Trustee may request modification of the Debtor's plan but such a postconfirmation modification is not permitted after payments under the confirmed plan have been completed"), *citing In re* Profit, 283 B.R. 567, 573 (9th Cir. BAP 2002). "This result would be of particular benefit to wealthy debtors who might have exempt reserves, such as IRAs, from which to fund immediate completion of a chapter 13 plan upon confirmation with no regard to future increases in income." Alane A. Becket & Thomas A. Lee III, *Applicable Commitment Period: Time or Money?*, AM. BANKR. INST. J. 16, 44 (March 2006).[26]

Based on the above analysis, this court holds that "applicable commitment period" is solely temporal. If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the proposed plan under Section 1325(b), the debtor must then propose a plan of either three or five years depending on debtor's income in relation to the applicable state median income. *See In re* Crittendon, 2006 WL 2547102, at *5 (Bankr. M.D.N.C. 2006); *In re* Cushman, 350 B.R. 207, 212 (Bankr. D.S.C. 2006). If, as in the current case, a debtor is above the applicable state median income, he can only propose a five-year plan and cannot propose a plan allowing full plan payoff in a shorter time unless the plan pays 100% of the allowed unsecured claims under Section 1325(b)(4)(B).[27]

**IV. Vehicle Ownership Expense under B22C**

---

[26]"Is it really 'better' and more consistent with the provisions of the Bankruptcy Code to have the issue of an early plan payoff resolved by 'the proverbial race to the courthouse' between the debtor and the chapter 13 trustee and/or interested creditors, as recently determined by the bankruptcy court in *In re* Drew, 325 B.R. 765, 774 (Bankr. N.D. Ill. 2005)?" *In re* Schiffman, 338 B.R. 422, 435 n.9 (Bankr. E.D. Va. 2005).

[27]Although this court does not rule on the issue of early payoff of chapter 13 plans, the foregoing analysis would imply that such payments may not be allowed under the Bankruptcy Code as modified by BAPCPA unless the debtor files and confirms a modification of his or her plan that permits such a payoff. *Cf.* Sunahara v. Burchard (*In re* Sunahara), 326 B.R. 768 (9th Cir. BAP 2005).

The final issue in this case is the question of whether Mr. Slusher can deduct a vehicle ownership expense on Form B22C, and then deduct that same amount from his "projected disposable income" when he owns the vehicle free of any liens. Based on this court's holding on what constitutes "projected disposable income," this issue no longer determines plan confirmation. Given the court's view on projected disposal income, however, the disposable income determination under Form B22C is still relevant. It creates a presumption as to whether the debtor is devoting all of his "projected disposable income" to his plan. And Form B22C requires calculation of vehicle ownership expenses.

A. *The General Requirements of Section 1325(b)(3) for Above-Median Income Debtors*

Under Section 1325(b)(3), "[a]mounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of Section 707(b)(2)." This congressional directive has proved nettlesome and ambiguous to many courts. *See, e.g., In re* McGuire, 342 B.R. 608, 612-613 (Bankr. W.D. Mo. 2006); *In re* Fowler, 349 B.R. 414, 416 (Bankr. D. Del. 2006). The source of the confusion lies in part in the language Congress used in Section 707(b)(2)(A)(ii)(I), which states that:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtors resides . . . .

At first glance, this text would appear to authorize the "applicable" IRS monthly expense amounts set forth in the IRS' "National Standards and Local Standards," combined with the debtor's actual monthly expenses for expenses falling into the IRS' "Other Necessary Expenses." Determining these amounts with any certainty, however, can be difficult.

B. *"Applicable" Expenses Under the "National Standards and Local Standards"*

In this case, Mr. Slusher claims that he is entitled to add $471 to his monthly

expenses.[28]  He obtains that figure by looking up the IRS' "Ownership Costs" for one car under its "Allowable Living Expenses for Transportation."[29]  He does not look at any other information source, because he contends he is not required to do so.  As far as his argument goes, it has merit.  When considered in isolation, which is the manner the Office of the United States Trustee uses on its website, the Local Standards do not indicate that the deduction is dependent on the existence of any encumbrance on the car.  *See, e.g.,* http://www.usdoj.gov/ust/eo/bapcpa/20060213/bci_data/IRS_Trans_Exp_Stds_WE.htm.

The trustee counters by claiming that such "ownership" expenses are in the nature of acquisition expenses.  The trustee's argument continues by noting that because Mr. Slusher owns his car free and clear, he has no "applicable" acquisition expense.  As will be seen, this position is consistent with IRS administrative interpretations of the applicable standards.

These competing views require the court to construe how Section 1325(b)(3) incorporates Section 707(b)(2).  That inquiry starts with Section 707(b).  There is no doubt that Section 707(b)(2) is one of the cornerstones of BAPCPA.  In that section, Congress attempted to create an administrative mechanism to test the ability of chapter 7 debtors to repay their debts; or, in other words, it sought to create a "means test" to assess whether debtors had the means to repay their creditors.

In developing the "means test," Congress could have started from scratch, and created a system that was rigid but easy to administer, such as many view workers' compensation or social security schemes.  But Congress did not do that.  Rather, it incorporated into the Bankruptcy Code an existing, administrative system that the IRS had long had in place.  *See* Announcement 95-37, 1997–35 I.R.B. 9 (1997) (announcing that long standing collection financial standards would be placed on the World Wide Web).  That system had and has a

---

[28]Mr. Slusher is also permitted a $338 expense for operating costs because he lives in the "West Region" and operates one vehicle.  *See* http://www.irs.gov/businesses/small/article/0,,id=104623,00.html.

[29]http://www.irs.gov/businesses/small/article/0,,id=104623,00.html.

1  purpose similar to Section 707(b): to assess the ability of a debtor to pay his or her

2  outstanding obligations.

3       The issue presented is whether in incorporating this IRS system, Congress intended

4  to incorporate only the static numbers identified by the statutory reference to applicable

5  "National Standards and Local Standards," or whether the language Congress used indicates

6  that Congress incorporated the IRS' logic and rationale used to define the Standards,

7  including its many opportunities for discretion in its administration.

8       Part of the problem in resolving this issue lies in the level of informality of the

9  standards; they are not statutory, nor are they promulgated by regulation.  According to the

10  IRS' website, the standards are part of the tax collection process, and are referred to as part

11  of the "Collection Financial Standards."  They are part of an internal administrative process

12  "used to help determine a taxpayer's ability to pay a delinquent tax liability."[30]  As stated by

13  the IRS on the same website,

14       Allowances for food, clothing and other items, known as the National
         Standards, apply nationwide except for Alaska and Hawaii, which have their
15       own tables. Taxpayers are allowed the total National Standards amount for
         their family size and income level, without questioning amounts actually spent.
16
         Maximum allowances for housing and utilities and transportation, known as
17       the Local Standards, vary by location. Unlike the National Standards, the
         taxpayer is allowed the amount actually spent or the standard, whichever is
18       less.

19       IRS Local Standards include transportation expenses, separated into ownership costs

20  and operating costs.  The ownership costs are uniform nationally, and when Mr. Slusher filed

21  bankruptcy, they included a $471 expense deduction for one vehicle.  Operating costs, on the

22  other hand, are based on U.S. Census region, and included a $338 deduction for the monthly

23  cost of operating one vehicle in the Western Census region.[31]

24       Mr. Slusher claimed both the $338 operating cost and the $471 ownership cost (albeit

25  _____

26       [30]http://www.irs.gov/individuals/article/0,,id=96543,00.html.

     [31]http://www.usdoj.gov/ust/eo/bapcpa/20060213/bci_data/IRS_Trans_Exp_Stds_WE.htm.

24

1    at the incorrect levels of $305 and $475, respectively[32]) for his 1982 Mazda short bed truck.

2    The trustee has no dispute with the claimed operating costs, but argues that Mr. Slusher has

3    improperly claimed the ownership expense, because the lack of any debt owed on his car

4    renders the ownership expense no longer "applicable" to him.

5          C. *The Standards "Applicable" to Mr. Slusher*

6          What does the word "applicable" mean in this context?[33]  Does it mean, as the debtor

7    suggests, that you cross-match the debtor's location and status against the standards as

8    published, and no more?  Or does it mean, as the trustee contends, that this court should

9    interpret the standards as the IRS would, including any direction or discretion given to IRS

10    employees by the IRS internal publications?

11          As noted by the trustee, its position is consistent with the published position of the

12    IRS.  Their website indicates that "[u]nlike the National Standards, the taxpayer is allowed

13    the amount actually spent or the standard, whichever is less" for expense items such as cars

14    covered by the Local Standards.  This is backed by a statement in the Internal Revenue

15    Manual, a set of administrative guidelines for interpreting, among other things, the Collection

16    Financial Standards.[34]  The relevant section states that:

17            If a taxpayer has a car payment, the allowable ownership cost added to the
             allowable operating cost equals the allowable transportation expense.  *If a*

18            *taxpayer has no car payment only the operating cost portion of the transportation*

---

19        [32]The numbers used by Mr. Slusher were only valid from October 17, 2005 to February 12,

20    2006.  Because he filed for bankruptcy on March 17, 2006, the correct figures are $338 and $471.  *Id.*

21        [33]"Applicable" can be interpreted in several different ways, none of which lead to an entirely
    consistent result in all situations.  If "applicable" is viewed as requiring an objective expense

22    deduction regardless of the presence of a lien on the vehicle, debtor would receive the full expense
    deduction even though no debt is owed on his car.  Extending this rationale could allow a debtor to

23    take a deduction for a car that not only has no lien, but is not even being used by the debtor or his
    family.  A different interpretation of "applicable" could result in an expense deduction only when the

24    vehicle is subject to a lien.  Under that interpretation, the debtor in this case would not be able to take
    any deduction for his car, yet he would be able to take a full ownership deduction if his car had been

25    subject to a $1 lien. *See In re* Barraza, 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006); *In re* Harris, 2006 WL
    2933891, at *3 (Bankr. E.D. Okla. 2006).

26

        [34]http://www.irs.gov/irm/part5/index.html.

1    *standard is used to figure the allowable transportation expense*.

2    Internal Revenue Manual § 5.15.1.7.4.B (2004), http://www.irs.gov/irm/part5/ch15s01.html

3    (emphasis added).

4    Several courts do not consider IRS practice in their interpretation. In their view,

5    Section 707(b)(2)(A)(ii) can only be viewed as providing an objective expense deduction

6    regardless of whether the debtor owes a debt for the vehicle. *See In re* Demonica, 345 B.R.

7    895, 902 (Bankr. N.D. Ill. 2006); *In re* Fowler, 349 B.R. 414, 420 (Bankr. D. Del. 2006); *In re*

8    Hartwick, 2006 WL 2938700, at *2 (Bankr. D. Minn. 2006). In the reasoning of these courts,

9    to hold otherwise would cause "applicable" to mean "actual." *See* Demonica, 345 B.R. at 902

10    ("In order to give effect to every word in the statute, the term 'actual monthly expenses'

11    cannot be interpreted to mean the same as 'applicable monthly expenses.' The term 'actual

12    monthly expenses' refers to the 'categories specified as Other Necessary Expenses issued by

13    the Internal Revenue Service.' Therefore, the Debtor's actual monthly expenses are relevant

14    only for those categories specified as Other Necessary Expenses."); *accord In re* Wilson, 2006

15    WL 3591266, at *5-6 (Bankr. D. Del. 2006); *In re* Grunert, 2006 WL 3359417, at *3 (Bankr. E.D.

16    Wis. 2006).

17    This court reluctantly and respectfully disagrees with the holdings in *Demonica* and

18    *Fowler*. A natural reading of the statute would indicate that the juxtaposition of "actual" with

19    the term "applicable" means that there may be situations in which these modifiers limit the

20    deductions in different ways. For example, a debtor may deduct only the *actual* amount of

21    Other Necessary Expenses, regardless of the amount of those expenses. In contrast, a debtor

22    can deduct the amount specified by the IRS for expenses falling under the IRS' National and

23    Local Standards, even if such scheduled amounts are higher or lower than the debtor's actual

24    expenses. Under this reading, "actual" and "applicable" do mean two different things – one

25    is a limitless deduction within the specified categories of Other Necessary Expenses, and the

26    other is a deduction limited to the amount and type specified by the IRS. Had Congress

26

1  intended to indiscriminately allow all expense amounts specified in the National and Local

2  Standards, it would have written 707(b)(2)(A)(ii)(I) to read, "The debtor's monthly expenses

3  shall be the monthly expense amounts specified under the National Standards and Local

4  Standards …" rather than "The debtor's monthly expenses shall be *the debtor's applicable*

5  monthly expense amounts specified under the National and Local Standards …" (Emphasis

6  added).  *See In re* Wiggs, 2006 WL 2246432, at *2 (Bankr. N.D. Ill. 2006) ("[T]he term

7  'applicable' modifies the amounts specified to limit the expenses to only those that apply. …

8  If the language were interpreted to allow every debtor the full National and Local Standard

9  amount the term 'applicable' would be superfluous.").  This distinction may not appear from

10  the dictionary definitions of both terms, but it did, and does, belong to the IRS' historical and

11  practical use of those standards at the time Congress adopted BAPCPA.  In referring to such

12  specialized standards, it would be quite odd if Congress intended to preclude courts from

13  examining the context in which the authoring agency, the IRS, used and employed those

14  standards.

15      For better or worse, Congress referred to the IRS National and Local Standards in

16  Section 707(b)(2)(A).  To understand what requirements this incorporation imposes would

17  seem to require courts to look at how the IRS defines these categories, and how the IRS

18  calculates those expenses.  Disagreeing with this approach somewhat, *Demonica* and *Fowler*

19  argue that "applicable," in the context of transportation expenses, relates only to the number

20  of vehicles owned by the debtor, not to whether the debtor is making payments on the

21  vehicle.   But why apply the standards so ambiguously?   If the standards are applied

22  regardless of IRS practice with respect to the allowance of such expense deductions, why then

23  allow an extra deduction for a second car?  Isn't the extra deduction for a second car just as

24  much an administrative determination by the IRS as to what a taxpayer can afford as is the

25  specification of when the expense is allowed?

26      Congress' decision to use the IRS standards within the Bankruptcy Code strongly

27

suggests that courts should look to how the IRS determined those standards; that is, as to how the IRS would have applied them in similar circumstances.[35]  In making that inquiry, it makes no sense to turn a blind eye to existing administrative interpretations of the very text Congress has specified.  And such interpretations exist.  The IRS' IRM sets forth various administrative interpretations of the financial collection standards for many cases.  As a result, if guidance is sought on the meaning of the IRS standards Congress incorporated into the Bankruptcy Code, practical reason would suggest that courts should consider the full manner by which the IRS uses these standards.[36]

In this case, it is important to note that the IRS explicitly states that the "transportation standards consist of nationwide figures for loan or lease payments referred to as ownership costs, and additional amounts for operating costs broken down by Census Region and Metropolitan Statistical Area.  Operating costs were derived from BLS data."  IRM § 5.15.1.7.4.B (2004), http://www.irs.gov/irm/part5/ch15s01.html.  Thus, as interpreted by the IRS, the concept of ownership expense is inextricably linked to the requirement for payments on a vehicle loan or lease.  Ignoring that aspect of the ownership expense while attending to the allowance based on number of cars effectively would create a judicial definition of ownership expense, rather than the definition mandated by Congress in its

---

[35]Courts used the IRS standards pre-BAPCPA as well.  *See* Educ. Credit Mgmt. Corp. v. Howe (*In re* Howe), 319 B.R. 886 (9th Cir. BAP 2005) (using the IRS standards as an aid in determining a minimal standard of living for the "undue hardship" test required to discharge a student loan under section 523(a)(8)); Voelkel v. Naylor (*In re* Voelkel), 322 B.R. 138, 147 (9th Cir. BAP 2005) (considering the IRS standards when determining whether a bankruptcy court abused its discretion in finding substantial abuse under Section 707(b)(2)); *but cf.* Harris v. United States Trustee (*In re* Harris), 279 B.R. 254, 260 (9th Cir. BAP 2002) (upholding a bankruptcy court's rejection of the IRS standards in determining substantial abuse under 707(b)).

[36]It might be objected that this reading preserves for bankruptcy judges the type of discretion that Congress sought to extirpate.  This court, however, does not read the revisions to chapter 7 and chapter 13 to completely and utterly remove discretion from bankruptcy judges; that would be unwise and produce a system full of injustices for debtors and creditors alike.  But adoption of the Financial Collection Standards as administered did, in fact, reduce significantly the discretion a court has to find abuse in many cases.

1    requirement that debtors use the Local Standards under Section 707(b).

2            Therefore, the debtor in this case cannot take a vehicle ownership deduction under the

3    Local Standards for a vehicle for which he is making no loan or lease payments; that would

4    be inconsistent with the manner in which the IRS calculated and created the Local Standards.

5    For that reason, the debtor's claimed – and phantom – $471 expense will not be allowed in

6    the calculation of projected disposable income.

7            That, however, is not the end of the matter.  As discussed in other cases, the debtor is

8    allowed an additional operating expense deduction of $200 for older cars.  *See In re* McGuire,

9    342 B.R. 608, 613 (Bankr. W.D. Mo. 2006) ("[C]onsistent with IRS Local Standards, [the

10   debtors] are entitled to claim on Form B22C an additional operating expense of $200, which

11   expense is allowed for debtors with cars more than six years old, or having more than 75,000

12   miles"); *accord In re* Oliver, 305 B.R. 294, 297 (Bankr. W.D. Tex. 2006); *In re* Carlin, 348 B.R.

13   795, 798 (Bankr. D. Or. 2006); *In re* Barraza, 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006).  The

14   IRM does not allow a deduction *in addition to* the ownership or operating expense, but rather

15   allows "an additional operating expense."   IRM § 5.8.5.5.2 (2005),

16   http://www.irs.gov/irm/part5/ch08s05.html.   Because the IRM construes the extra

17   deduction as part of the operating expense, this court views it as part of the definition of that

18   expense and would allow it.

19   **V.  Conclusion**

20           For the reasons stated above, confirmation of Mr. Slusher's plan is denied.   This

21   opinion shall constitute the findings of fact and conclusions of law under FED. R. BANKR. P.

22   7056 (incorporated by virtue of FED. R. BANKR. P. 9014).  The court will enter a separate order

23   complying with FED. R. BANKR. P. 9021 denying confirmation.

24

25   Copies sent to:

26   David Krieger; davkrieg@hainesandkrieger.com

1     Kathleen A. Leavitt; courtsecf3@las13.com

2     Rick Yarnall
    701 Bridger Avenue, #820
3     Las Vegas, NV 89101

4     Donald Slusher
    4301 Cory Place
5     Las Vegas, NV 89107

6

                                                        # # #

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26